**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| Eurkert Boardley, *et ux.*, | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| Household Finance Corporation III, *et al.*, | * |
| Defendants. | * |
| | * |

Case No.: PWG-12-3009

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Plaintiffs Eurkert Boardley and Senta Boardley, who believe that Defendants Household Finance Corp. III ("Household") and HSBC Holdings Inc., plc ("HSBC") lured them in through bait and switch tactics, entered into a loan agreement with Defendants with higher monthly payments than Plaintiffs believed they could afford, on the understanding that they soon could refinance for a lower monthly amount. After years of deferments, attempted refinancing, over $60,000 in payments made, and what Plaintiffs characterize as misrepresentations by Defendants, Plaintiffs found themselves facing foreclosure. In response, they brought this multi-count action against Defendants, who now move to dismiss all counts. Plaintiffs oppose the motion and seek leave to file a Second Amended Complaint, eliminating one count and amending two of the remaining twelve.[1] Plaintiffs' Amended Complaint fails to state a claim on

---

[1] Briefing of Defendants' Second Motion to Dismiss Amended Complaint, ECF No. 24, is complete. *See* ECF Nos. 24-1, 31 & 32. Plaintiffs have filed a Motion for Leave to Amend and First Supplement to Motion for Leave to Amend, ECF Nos. 33 and 34, to which Defendants filed an Opposition, ECF No. 35. Plaintiffs have not filed a reply, and the time for doing so has passed. *See* Loc. R. 105.2(a). A hearing is not necessary on either motion *See* Loc. R. 105.6. For the reasons stated in this Memorandum Opinion, Defendants' Motion IS GRANTED IN

all but the count for breach of contract, but Plaintiffs' proposed Second Amended Complaint rectifies the pleading of Plaintiffs' Maryland Consumer Protection Act claim. Therefore, the breach of contract and consumer protection claims will proceed, while all other claims will be dismissed.

## I.   BACKGROUND[2]

Defendant HSBC, "a British multinational banking and financial services holding company," is the parent company of Defendant Household, which operated a branch of HSBC in Mitchellville ("Mitchellville Branch").  Am. Compl. ¶¶ 5–6.  After receiving "solicitations for a $6,000 line of credit from Defendants," Plaintiffs, who are African-American, went to the Mitchellville Branch on June 18, 2007, where Household representative Candace Geter informed them that "they were not eligible for the $6,000 line of credit originally solicited, but instead were eligible for a $19,000 line of credit, which she claimed . . . would be the same as the $6,000 line of credit," because Plaintiffs could use "the additional $13,000 . . . to pay the approximately $1,100 increase in their monthly mortgage payments over the initial six (6) month period."  *Id.* ¶¶ 8–11.  When Plaintiffs "told Candace Geter that they could not afford to make the monthly payments past the initial six (6) month time period," she and her supervisor "led the Boardleys to believe" that they could refinance in six months "to lower the monthly payment amount."  *Id.* ¶¶ 12–13.  But, after six months, "Defendants did not give the Boardleys an opportunity to lower their payments," *id.* ¶ 14, telling them instead that they could refinance in another six months and

---

PART AND DENIED IN PART, and Plaintiffs' Motion IS GRANTED IN PART AND DENIED IN PART.  This Memorandum Opinion disposes of ECF Nos. 24 and 33.

[2] For purposes of considering whether Plaintiffs have stated a claim in their Amended Complaint or proposed Second Amended Complaint, this Court accepts the facts that Plaintiffs alleged in their Amended Complaint, ECF No. 21, and, where relevant, Second Amended Complaint, ECF No. 34-1, as true.  *See Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011).

"refer[ing] Mr. Boardley to a pamphlet he had previously been unaware of that outlined certain time periods and options for refinancing," *id.* ¶ 15.

Plaintiffs made their mortgage payments until August 2008, when they called Defendants because they "could [no] longer afford the monthly mortgage payment." Am. Compl. ¶¶ 16–17. Defendants would not "lower the payments as promised," but they "offered a deferment plan," under which "the late payment could be deferred to the end of the loan if the Boardleys made two payments over sixty (60) days and agreed to a reduced monthly payment." *Id.* ¶¶ 18–19. After refusing to put the deferment plan in writing, Defendants "claimed that the Boardley's second payment was late," even though Plaintiffs had complied with the plan, and insisted that Plaintiffs "would have to attempt a second deferment." *Id.* ¶¶ 19–21. Plaintiffs agreed to a second deferment plan, which also was not in writing, with the understanding that "their new regular monthly payment would be approximately $1,200 on a permanent basis." *Id.* ¶¶ 22, 24.

Thereafter, Plaintiffs' new mortgage coupons and October 2009 escrow statement indicated that the monthly payment amount "was $1,512.68, which caused the Boardleys to believe their loan terms had been resolved." *Id.* ¶¶ 24–25. Plaintiffs made their monthly payments until April 2010, at which time "Defendants, unilaterally and without notice, renounced the agreed upon payment of approximately $1,200 and demanded an immediate payment of $4,721.93." *Id.* ¶¶ 25, 27. Additionally, "Defendants sent the Boardleys a 'Breach of Contract' letter stating the amount they owed was over $13,000." *Id.* ¶ 28. Defendants also informed Plaintiffs by phone that "their monthly payments were actually $4,261.29 and that no payment had been received since December of 2009." *Id.* ¶ 30. In response to a call from Defendants' collection representative in April 2010, Plaintiffs withdrew retirement funds, "incur[ing] additional taxes," and paid Defendants $3,000, but Plaintiffs "continued to receive

calls from the Defendants' collection department." *Id.* ¶¶ 31, 32, 56.   They claim that "Defendants' records indicated a debit of $847.24," rather than a payment of $3,000. *Id.* ¶ 64.

Plaintiffs entered into another deferment plan in May, 2010, under which they agreed to pay $4,261 per month for three months so that they "would be eligible for a reduced monthly payment," and they complied with the terms of the plan.   Am. Compl. ¶ 33.   Thereafter, "Defendants' representative … told the Boardleys that they would be included in Defendants' 'Fresh Start' program, but [not] until July 31st." *Id.* ¶ 34.   Yet, when Plaintiffs called Defendants on August 5, 2010, Defendants' representative said that he could not give them information about the status of their deferment.   *Id.* ¶ 35.   Then, on December 24, 2010, Defendants' representative called Plaintiffs and informed them that "they owed over $60,000 and then laughed after he asked them whether they wanted to pay by cash or credit." *Id.* ¶ 39.   Plaintiffs made another payment of approximately $3,000 in February 2011 and "received a letter from Defendants acknowledging the Boardleys' efforts to make the loan current." *Id.* ¶¶ 40–41. Plaintiffs made one last payment of $3,414.05 in May 2011, "but Defendants returned this payment without any explanation." *Id.* ¶ 42.   In total, Plaintiffs paid Defendants approximately $62,000. *Id.* ¶ 55.

According to Plaintiffs, "Defendants did not credit the account" to reflect either the payments Plaintiffs made from April 2009 through July 2010, or the "overpayments to the escrow account made by the Boardleys during the life of their loan." *Id.* ¶¶ 65–67.   Plaintiffs sent letters to Defendants in November and December 2010 "to dispute the escrow charges." *Id.* ¶ 67.   Mrs. Boardley requested the escrow account statement by phone on January 31, 2012, but "Defendants claimed they had received a cease and desist letter and claimed they could not speak with the Boardleys." *Id.* ¶ 69; *see* Apr. 30, 2012 Ltr. to Pls., 2d Am. Compl. Ex. S, ECF No. 33-

3.  Plaintiffs sent another letter to Defendants on April 9, 2012.  Apr. 9, 2012 Ltr. to Defs., 2d Am. Compl. Ex. D, ECF No. 33-2. Defendants responded by letter on April 30, 2012, in which they itemized the total amount due on the account; Defendants also enclosed the latest escrow analysis, which dated back to October 15, 2010.  Apr. 30, 2012 Ltr. to Pls. 4.

Meanwhile, on November 25, 2009, Defendants entered into a class action settlement agreement ("Settlement Agreement" or "Agreement") pertaining to alleged discriminatory practices.  *Id.* ¶ 57; Sett. Agr., Am. Compl. Ex. 1, ECF No. 22-1; Sett. Agr., Defs.' Mot. Ex. 2, ECF No. 24-3.  The class may have included Plaintiffs, although Plaintiffs did not learn of the class action lawsuit or Settlement Agreement until January 2010.  Am. Compl. ¶¶ 26, 58. Plaintiffs claim that Defendants, through their representatives, in phone calls with Plaintiffs spanning almost two years, "falsely denied that the Boardleys were eligible as class members and also denied the existence of the Class Action Lawsuit and the settlement agreement."  *Id.* ¶¶ 61–62.

On July 19, 2012, Plaintiffs "received a notice of intent to foreclose on their Home." Am. Compl. ¶ 53.  Thereafter, Plaintiffs filed a thirteen-count complaint, ECF No. 1, which, after Household moved to dismiss for failure to state a claim, ECF No. 11, they supplanted with a twelve-count Amended Complaint, alleging federal statutory and state common law violations, Am. Compl. ¶ 2.

## II.  MOTION FOR LEAVE TO AMEND

Whether to grant a motion for leave to amend is within this Court's discretion.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Where, as here, the deadline for amendment has not passed when the plaintiff files a second motion for leave to amend, Rule 15(a)(2) provides the standard for whether to grant the motion.  *See id.*; Fed. R. Civ. P. 15(a)(2).  Pursuant to Rule 15(a)(2),

"[t]he court should freely give leave [to amend] when justice so requires."  The Court only

should deny leave to amend if amendment "would prejudice the opposing party, reward bad faith

on the part of the moving party, or . . . amount to futility." *MTB Servs., Inc. v. Tuckman-Barbee*

*Constr. Co.*, No. RDB-12-2109, 2013 WL 1819944, at *3 (D. Md. Apr. 30, 2013); *see Foman*,

371 U.S. at 182 (stating that the court also may deny leave if the plaintiff has amended more than

once already without curing the deficiencies in the complaint); *Laber v. Harvey*, 438 F.3d 404,

426 (4th Cir. 2006).  Otherwise, "[i]f the underlying facts or circumstances relied upon by a

plaintiff may be a proper subject of relief," and the plaintiff moves to amend, the Court should

grant the motion so that the plaintiff has the "opportunity to test his claim on the merits."

*Foman*, 371 U.S. at 182.

Determining whether amendment would be futile does not involve "'an evaluation of the

underlying merits of the case.'" *MTB Servs.*, 2013 WL 1819944, at *3 (quoting *Next Generation*

*Grp. v. Sylvan Learning Ctrs., LLC.*, No. CCB–11–0986, 2012 WL 37397, at *3 (D. Md. Jan. 5,

2012)).  Rather, "the merits of the litigation" only are relevant to the Court's ruling on a motion

for leave to amend if "a proposed amendment may clearly be seen to be futile," *Davis v. Piper*

*Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980), such as "if the proposed amended complaint

fails to state a claim under the applicable rules and accompanying standards," *Katyle v. Penn*

*Nat'l Gaming Inc.*, 637 F.3d 462, 471 (4th Cir. 2011); *see MTB Servs.*, 2013 WL 1819944, at *3.

Plaintiffs contend that the proposed amendments "largely serve to clarify the violations"

and "are made in good-faith in response to alleged deficiencies in pleading proffered by

Defendants," such that they do not result in prejudice to Defendants.  Pls.' Mot. 2.  Defendants

do not contend that they will suffer prejudice or that Plaintiffs act in bad faith.  Rather, they

focus on the contents of the amendments and argue that such amendments would be futile

because Plaintiffs still would fail to state a claim. Defs.' Opp'n 14. Because the standard for assessing futility is the same as that for ruling on a Rule 12(b)(6) motion to dismiss, I will consider whether the proposed amendments are futile in conjunction with whether Plaintiffs have stated a claim under each count of their Amended Complaint. *See Sall v. Bounassissi*, No. DKC-10-2245, 2011 WL 2791254, at *4 (D. Md. July 13, 2011).

### III. SECOND MOTION TO DISMISS AMENDED COMPLAINT

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012). This rule's purpose "'is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Id.* (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). To that end, the Court bears in mind the requirements of Fed. R. Civ. P. 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), when considering a motion to dismiss pursuant to Rule 12(b)(6). Specifically, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678–79. *See Velencia*, 2012 WL 6562764, at *4 (discussing standard from *Iqbal* and *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. The Court "may consider the complaint itself and any documents that are attached to it," as well as any "document that the defendant attaches to its motion to dismiss if the document was integral to and explicitly relied on in the complaint and if

7

the plaintiffs do not challenge its authenticity." *CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citations and quotation marks omitted).   . Additionally, a plaintiff fails to state a claim where the allegations on the face of the complaint show that an affirmative defense, such as the statute of limitations, would bar any recovery. *Jones v. Bock*, 549 U.S. 199, 214–15 (2007) (citing Fed. R. Civ. P. 8(c)); *see Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996) (noting that dismissal is proper "when the face of the complaint clearly reveals the existence of a meritorious affirmative defense").

Plaintiff's fraud allegations must meet the "heightened pleading standard under Rule 9(b)." *Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC-11-3758, 2013 WL 247549, at *5 (D. Md. Jan. 22, 2013).  "[A]llegations [of fraud] typically 'include the "time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby."'"  *Id.* (citations omitted); *see Spaulding v. Wells Fargo Bank, N.A.*, No. 12-1973, 2013 WL 1694549, at *9 (4th Cir. Apr. 19, 2013).

## IV.   SUFFICIENCY OF PLEADINGS

### A.  Real Estate Settlement and Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–2617 (Count I)

Congress enacted RESPA "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process" and "to effect certain changes in the settlement process for residential real estate," such as the reduction of "the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance."  12 U.S.C. § 2601(a), (b)(3).  In their Amended Complaint, Plaintiffs claim that Defendants violated three provisions of RESPA, 12 U.S.C. §§ 2605(e)(2)(A), 2609(a) and(c)(2), Am. Compl. ¶¶ 76–81, and in their proposed Second

Amended Complaint, they add an allegation that Defendants violated a fourth provision of RESPA, 12 U.S.C. § 2605(e)(2)(K).  2d Am. Compl. ¶¶ 81–82, ECF No. 34-1.

### 1.  Alleged § 2609 violations

According to Plaintiffs, Defendants violated 12 U.S.C. § 2609(a) "by requiring the Boardleys to deposit an amount in escrow greater than that legally permitted," Am. Compl. ¶ 79, and § 2609(c)(2) by "failing to provide escrow account statements," *id.* ¶ 80.  Defendants contend that "RESPA does not provide a private right of action for any alleged violation of Section 2609 relating to escrow accounts." Defs.' Mem. 9.  12 U.S.C. § 2614, which provides for private rights of action under RESPA, only "provides a private right of action for actions brought pursuant to 12 U.S.C. §§ 2605, 2607, and 2608."  *McKinney v. Fulton Bank*, 776 F. Supp. 2d 97, 103 (D. Md. 2010).  Although Plaintiffs correctly assert that *McKinney* does not address § 2609 specifically, Pls.' Opp'n 3, the Fourth Circuit has held that 12 U.S.C. § 2609 in particular does not "give[] rise to a private cause of action."  *Clayton v. Raleigh Fed. Sav. Bank*, 107 F.3d 865 (Table), 1997 WL 82624, at *1 (4th Cir. Feb. 27, 1997).  In *Clayton*, the Fourth Circuit observed that "12 U.S.C. § 2609[] prohibits banks from requiring excessive tax and insurance escrow deposits from mortgage borrowers," but it affirmed the dismissal of the Claytons' amended complaint for failure to state a claim under § 2609, concluding that there was no "congressional intent to create a private right of action."  *Id.*  Therefore, Plaintiffs' claims based on violations of § 2609 will be dismissed.  *See id.*; *McKinney*, 776 F. Supp. 2d at 103.

### 2.  Alleged § 2605(e)(2)(A) violations in Amended Complaint

Plaintiffs claim that Defendants violated 12 U.S.C. § 2605(e)(2)(A) by failing to "make appropriate corrections" to Plaintiffs' account in response to their December 2010 and January 2011 requests.  *See* Am. Compl. ¶¶ 76–78.  "Among other provisions, RESPA requires a

mortgage servicer to respond to a borrower's 'qualified written request' ('QWR')." *Galante v.*

*Ocwen Loan Servicing LLC*, No. ELH-13-1939, 2014 WL 3616354, at *32 (D. Md. July 18,

2014) (citing 12 U.S.C. § 2605(e)(1)(A), (B)).  Section 2605(e)(2) provides

> **§ 2605. Servicing of mortgage loans and administration of escrow accounts**
>
> (e) Duty of loan servicer to respond to borrower inquiries
>
> . . .
>
> (2) Action with respect to inquiry
>
> Not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall--
>
> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
>
> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
>
> (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
>
> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; *or*
>
> (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
>
> (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
>
> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

12 U.S.C. § 2605(e)(2)(A)–(C) (emphasis added).  Significantly, the provision is disjunctive: A

servicer may comply with § 2605(e)(2) *either* by correcting the account *or* by explaining why it

believes the account already is correct, *or*, if the borrower requested information rather than a

correction, by providing the information or explaining why it is unable to do so. *See id.* Therefore, a failure to "make appropriate corrections," as provided for in § 2605(e)(2)(A), is not necessarily a violation of § 2605(e)(2), as the servicer may have complied with subsection (B) or (C) instead. *See id.*

Even though Defendants previously moved to dismiss this count for failure to state a claim, and Plaintiffs filed an Amended Complaint in response to "elaborate on" their pleadings and "to cure any alleged deficiency of pleading posed by vagueness," *see* Pls.' Mot. to Am. 4, ECF No. 17, Plaintiffs only allege that Defendants "still have not made appropriate corrections to the Boardleys' escrow accounts, even though that have received multiple QWR's about it," without addressing whether Defendants instead have justified their decision not to change the account pursuant to § 2605(e)(2)(B). *See* Am. Compl. ¶¶ 76, 78. Because a servicer receiving a QWR[3] that requests a correction may comply with § 2605(e)(2) without making the correction to the account if the servicer's investigation leads the servicer to conclude that the account is correct, *see* 12 U.S.C. § 2605(e)(2)(B)(i), and Plaintiffs do not allege that Defendants failed to comply with the disjunctive options under that section, they have not stated a claim for a violation of § 2605(e)(2).

Plaintiffs also claim that "Defendants' failure to provide the Boardleys with any escrow account statements since October 2010" is evidence of "Defendants' failure to make appropriate corrections." Am. Compl. ¶ 77. As noted, the alleged failure to make corrections is not necessarily a violation of § 2605(e)(2). Further, Plaintiffs have not identified any provision of § 2605(e)(2) that requires the production of escrow statements. Therefore, Plaintiffs have failed to state a claim for a violation of § 2605(e)(2) in their Amended Complaint.

---

[3] For purposes of this section, I assume arguendo that Plaintiffs submitted a QWR to Defendants.

### 3.  Alleged § 2605(e)(2) violation in Second Amended Complaint

Plaintiffs' proposed Second Amended Complaint does not augment the discussion of Defendants' responses to the QWRs Plaintiffs purportedly submitted in December 2010 and January 2011.  Rather, it expands the allegations under § 2605 by identifying a third letter, dated April 9, 2012, that Plaintiffs insist is a QWR.  2d Am. Compl. ¶ 76 n.1.  Plaintiffs allege that "Defendants responded with a letter dated April 30, 2012," and that the "response demonstrates violations of 12 U.S.C. § 2605(e)(2)," such as Defendants' alleged failure to "investigate the allegations contained in the letter."  *Id.*  Plaintiffs attached these two letters to their proposed Second Amended Complaint and allege deficiencies in the response. *See id*. ¶ 76 n.1.

Defendants insist that this amendment would be futile because the April 2012 letter does not "identify the account number at issue or provide sufficient detail as to why the account is in error," and therefore "clearly was not a QWR." Defs.' Opp'n 2, 5.  Section 2605(e)(1)(B) defines a qualified written request as

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--
>> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

It is true that the April 9, 2012 letter does not include the borrowers' account number. Yet, the letter does provide the borrowers' names and address, the date of their loan, and the location at which they obtained the loan.  *See* Apr. 9, 2012 Ltr to Defs..  These details should be sufficient to "enables the servicer to identify, the . . . account of the borrower," as required by statute.  *See* 12 U.S.C. § 2605(e)(1)(B)(i).  Indeed, Defendants mailed a response on April 30,

2012, regarding "Account number: 17267659," which shows that they were able to identify the account. *See* Apr. 30, 2012 Ltr. to Pls. 1.

With regard to information in the letter from which Defendants could discern why Plaintiffs believed "that the account is in error" or what "other information" Plaintiffs sought, *see* 12 U.S.C. § 2605(e)(1)(B)(ii), Plaintiffs' counsel wrote that Plaintiffs "made all their payments from April 2009 through July 2010, but [Defendants] did not credit the account," and stated that Plaintiffs "demand[ed] that [Defendants] take steps immediately to work out this loan to put the Boardleys in the situation that [Defendants] promised them." Apr. 9, 2012 Ltr. to Defs. 2–3. Even though the letter is styled as a "Letter of Intent" from Plaintiffs' counsel, it clearly conveys that Plaintiffs believed their account was in error and the reasons for their belief, and it demands action from Defendants to rectify the situation. *See id.* Therefore, the April 9, 2012 letter constitutes a QWR. *See* 12 U.S.C. § 2605(e)(1)(B).

Defendants argue that, even if the letter was a QWR, "Household responded to the letter in a timely and appropriate manner." Defs.' Opp'n 2. It is undisputed that Defendants sent Plaintiffs a response but did not credit Plaintiffs' account as Plaintiffs requested. *See* 2d Am. Compl. ¶ 76 n.1, ¶ 82; Defs.' Opp'n 6. Therefore, they did not comply with § 2605(e)(2)(A). But, as noted, § 2605(e)(2) provides the servicer with two alternative responses to a QWR, in lieu of making "appropriate corrections." *See* 12 U.S.C. § 2605(e)(2)(A)–(C). The April 30, 2012 letter indicates that Defendants reviewed their records, and the letter provides "a written explanation or clarification that includes . . . a statement of the reasons for which the servicer believes the account of the borrower is correct." *See* 12 U.S.C. § 2605(e)(2)(B). Thus, it appears that Defendants complied with § 2605(e)(2)(B), and Plaintiffs have not shown otherwise. Consequently, in their proposed Second Amended Complaint, Plaintiffs fail to state a claim for a

violation of § 2605(e)(2) with regard to the April 12, 2012 letter.[4]   Therefore, this amendment would be futile.  Plaintiffs' motion for leave to amend is denied insofar as they seek to amend their claim for a violation of § 2605(e).

### 4.   Alleged § 2605(k) violation

12 U.S.C. § 2605(k) provides, in pertinent part, that "[a] servicer of a federally related mortgage shall not . . . fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties."  12 U.S.C. § 2605(k)(1)(C).  Plaintiffs claim in their proposed Second Amended Complaint that Defendants violated § 2605(k) by "continuously failing to take action to respond to the Boardleys' request to correct errors related to the allocation of payments" and by "failing to … perform their servicing duty of providing Annual Escrow Statements."   2d Am. Compl. ¶ 81.   They contend that § 2605(k)(1)(C) "incorporates by reference the rules set forth in Section 2609," including the requirement that a servicer "provid[e] an annual escrow statement," such that "the operative facts that form the violation under 12 U.S.C. § 2609 also constitute violations of 12 U.S.C. § 2605(k)(1)(C)."  Pls.' Opp'n 5.  In this regard, Plaintiffs allege that "Defendants have not provided . . . an annual escrow statement for . . . 2013."  2d Am. Compl. ¶ 70.

---

[4] In their proposed Second Amended Complaint, Plaintiffs allege that, in the April 30, 2012 letter, "Defendants admit that they did not investigate the allegations contained in the letter," and that other statements in the letter demonstrated that "Defendants failed to conduct an investigation."  2d Am. Compl. ¶ 76 n.1.  Insofar as this allegation, buried in a footnote, might have amended Plaintiffs' § 2605(e)(2) claim in their Amended Complaint to state a claim, it is negated by the attached document.  *See Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. JFM-10-206, 2010 WL 2732334, at *2 (D. Md. July 8, 2010) ("Where the allegations in a complaint conflict with the attached documents, the exhibits prevail.").

According to Plaintiffs, the proposed amendments to add a violation of 12 U.S.C. § 2605(k) is not futile because they "have already plead[ed] a violation under RESPA," and the new allegations "incorporate[] a fact from January 2014 regarding the failure to provide an escrow statement for 2013." Pls.' Mot. to Am. 2–3. Defendants counter that the amendment would be futile because § 2605(k) was not in effect prior to "January 2013 and is not applicable retroactively," and "Plaintiffs have not set forth any facts demonstrating a violation of that provision occurring *after* January 2013." Defs.' Opp'n 2.

Congress created § 2605(k) in 2010 as part of "Title XIV of the Dodd–Frank Wall Street Reform and Consumer Protection Act." *Houston v. U.S. Bank Home Mortg. Wisconsin Servicing*, 505 F. A'ppx 543, 547(6th Cir. 2012) (citing Pub. L. No. 111–203, § 1463, 124 Stat. 1376, 2182–84 (2010)). Title XIV's effective date, as amended,[5] was January 10, 2014. *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145 n.3 (10th Cir. 2013). This means that alleged violations prior to January 10, 2014—a year later than even Defendants suggest—are not actionable. *See Bever v. Cal-Western Reconveyance Corp.*, No. 11–CV–1584 AWI SKO, 2013 WL 5492154, at *5 (E.D. Cal. Oct. 2, 2013) (dismissal proper where Plaintiff relied on "12 U.S.C. § 2605(k)(1)(D), a part of the Dodd–Frank Act amendment to RESPA that had not gone into effect at the time [plaintiff] sent his letter"). Plaintiffs' Second Amended Complaint refers to "requests to correct errors" sent to Defendants in 2010, 2011, and 2012. But, because § 2605(k) was not in effect at the time, Defendants' alleged failure to respond is not actionable. *See id.*

As for Defendants' alleged failure to provide annual escrow statements, § 2609 provides that servicers must provide annual escrow statements "not more than 30 days after the conclusion of each . . . 1-year period," the first of which "begin[s] on the first January 1st that occurs after

---

[5] Prior to the amendment, the effective date was January 21, 2013. *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145 n.3 (10th Cir. 2013).

November 28, 1990." 12 U.S.C. § 2609(c)(2)(B). Thus, the most recent one-year period ended December 31, 2013, and Defendants had thirty days thereafter to provide the annual escrow statement. *Id.* Plaintiffs submitted their Second Amended Complaint on January 15, 2014, less than thirty days after the latest period concluded. Therefore, even assuming *arguendo* that Plaintiffs had a private right of action for this alleged violation via § 2605(k)(1)(C), Defendants were not in violation of 12 U.S.C. § 2609(c)(2)(B) because the time for providing the statement had not expired. Moreover, their alleged failures to provide escrow statements in previous years preceded the enactment of § 2605(k) and therefore are not actionable. *See Bever*, 2013 WL 5492154, at *5. Plaintiffs have failed to state a claim for a violation of § 2605(k). *See id.* Plaintiffs' motion for leave to amend is denied insofar as they seek to amend their claim for a violation of § 2605(e).

In sum, Plaintiffs' motion for leave to amend Count I is denied because it would be futile, and Count I is dismissed.

### B. Truth in Lending Act ("TILA"), 15 U.S.C. §1601 et seq. (Count II)

Congress passed TILA "to provide for the informed use of credit by consumers." *O'Dell v. Deutsche Bank Nat. Trust Co.*, No. 12-985 (JCC/IDD), 2013 WL 2389874, at *9 (E.D. Va. May 30, 2013) (citing 15 U.S.C. § 1601(a)). To that end, "TILA provides for a private right of action for civil liability against any creditor that fails to comply with any requirement imposed under TILA." *Id.* (citing 15 U.S.C. § 1640(a)). Plaintiffs claim that "Defendants failed to credit the Boardleys for payments made to their escrow account" and "failed to provide the Boardleys a statement of account within a reasonable amount of time under 12 CFR 1026[.36](c)(1)(iii), by failing to provide escrow account statements." Am. Compl. ¶¶ 84–85. 12 C.F.R. § 1026.36(c) is

a part of "Regulation Z," which is "[t]he regulation that implements TILA." *In re Davis*, No. 14 C 154, 2014 WL 1339720, at *2 (N.D. Ill. Apr. 3, 2014).

Defendants contend that Plaintiffs' TILA claim is time-barred because the one year statute of limitations applicable to TILA claims typically "accrues on the date of the loan transaction," and "even assuming Plaintiffs can state a claim based on Defendants' alleged failure to credit escrow payments and provide copies of escrow statements, this alleged conduct occurred before December 2010, more than one year before Plaintiffs filed this action on October 11, 2012." Defs.' Mem. 17–18.

15 U.S.C. § 1640(e) provides that, with exceptions not relevant here, "any action under [TILA] may be brought in any United States district court . . . within one year from the date of the occurrence of the violation." Plaintiffs allege that they made their last payment to Defendants in May 2011. Am. Compl. ¶ 55. Therefore, the latest date that Defendants could have "failed to credit the Boardleys for payments," *see id.* ¶ 84, was in May 2011, when Defendants received the last payment, more than a year before Plaintiffs filed suit. Insofar as Plaintiffs base their TILA claim on this alleged failure to credit Plaintiffs for payments, the statute of limitations ran before they filed suit, and their claim must be dismissed. *See* 15 U.S.C. § 1640(e).

I turn to Plaintiffs' TILA claim based on Defendants' alleged failure to provide escrow account statements after October 2010, Am. Compl. ¶ 85. Plaintiffs claim that this is a violation of 12 C.F.R. § 1026.36(c)(1)(iii), which pertains to "a[ny] consumer credit transaction secured by a consumer's principal dwelling" and requires servicers "to provide, within a reasonable time after receiving a request from the consumer or any person acting on behalf of the consumer, an accurate statement of the total outstanding balance that would be required to satisfy the

consumer's obligation in full as of a specified date." Put another way, servicers have to tell borrowers the account balance, or payoff amount, when asked. *See generally US Distressed Mortgage Fund, LLC v. Wells Fargo Bank, N.A.*, No. C 13-5177-LB, 2014 WL 2602173, at *6–7 (N.D. Cal. June 10, 2014) (noting, with regard to a claim under 12 C.F.R. § 1026.36(c)(1)(iii) that the plaintiff had demanded a "payoff statement"). While Mrs. Boardley requested, without success, the *escrow account* statement by phone on January 31, 2012, 2d Am. Compl. 69; *see* Apr. 30, 2012 Ltr. to Pls., the escrow account statement is distinct from the account balance. Indeed, I could not locate any case that discussed Regulation Z with regard to escrow account statements. Plaintiffs have neither alleged, nor shown through the correspondence they attached to the various iteration of their Complaint, that they ever requested a statement of their account balance. Consequently, Plaintiffs have failed to state a claim under TILA. *See* 12 C.F.R. § 1026.36(c)(1)(iii).

### C. Breach of the Settlement Agreement and Implied Covenants of Good Faith and Fair Dealing" (Count XII)

Plaintiffs' twelfth count is for "Breach of the Settlement Agreement and Implied Covenants of Good Faith and Fair Dealing." Compl. 25 & ¶¶ 157–62. Given that breach of the implied covenants of good faith and fair dealing is not an independent cause of action in Maryland, *see Mount Vernon Props., LLC v. Branch Banking & Trust Co.*, 907 A.2d 373, 381 (Md. Ct. Spec. App. 2006); that "Rule 10(b) provides that, '[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence ... must be stated in a separate count,'" *Cunningham v. LeGrand*, No. 11-142, 2011 WL 1807360, at *2 (S.D. W. Va. May 10, 2011) (quoting Fed. R. Civ. P. 10(b)); and that Plaintiffs' counsel most assuredly is aware of this case law, *see Sterling v. Ourisman Chevrolet of Bowie, Inc.*, 943 F. Supp. 2d 577 (D. Md. 2013) (in which Plaintiffs' counsel represented Ms. Sterling), I construe Plaintiffs' twelfth count to be

one claim for breach of contract (namely, the settlement agreement), based on a breach of the implied covenants of good faith and fair dealing.[6]  *See* Fed. R. Civ. P. 1; *Mount Vernon Props.*, 907 A.3d at 381 ("'The implied duty of good faith "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract."'" (quoting *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 794 (D. Md. 2002) (citation omitted))).

A breach of contract is "a failure without legal excuse to perform any promise which forms the whole or part of a contract . . . ."  *In re Ashby Enters., Ltd.*, 250 B.R. 69, 72 (Bankr. D. Md. 2000) (quoting *Conn. Pizza, Inc. v. Bell Atl.-Wash., D.C., Inc.*, 193 B.R. 217, 225 (Bankr. D. Md. 1996) (quoting *Weiss v. Sheet Metal Fabricators, Inc.*, 110 A.2d 671, 675 (Md. 1955)) (quotation marks omitted)).  A contract exists where there is "'mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration.'" *Spaulding v. Wells Fargo Bank, N.A.*, No. 12-1973, 2013 WL 1694549, at *9 (4th Cir. Apr. 19, 2013) (quoting *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004)).

Plaintiffs attach a copy of the Settlement Agreement to their Amended Complaint, and Defendants attach it to their Motion to Dismiss.  *See* Sett. Agr., Am. Compl. Ex. 1, ECF No. 22-1; Sett. Agr., Defs.' Mot. Ex. 2, ECF No. 24-3.  It defines the class as

> All African-American or Hispanic persons throughout the United States who, between January 1, 2004 and the date of entry of the Preliminary Approval

---

[6] While I have construed Count XII to be a breach of contract claim pursuant to Fed. R. Civ. P. 1, this does not excuse what may be a Rule 11 violation by Plaintiff's counsel for attempting to bring a claim for breach of implied covenants of good faith and fair dealing, despite knowing that this cause of action does not exist.  While I do not find it necessary at this time to require a response from counsel for the Plaintiff pursuant to Fed. R. Civ. P. 11(c)(1), it would be unwise for Plaintiff's counsel to continue this conduct in future pleadings.

Order,[7] obtained residential closed-end real estate secured loans from any of the following businesses: Decision One, HFC/Beneficial, HSBC Mortgage Corp. (USA) or HSBC Mortgage Services Telesales.

The parties agree that Defendants were parties to the Settlement Agreement. Am. Compl. ¶ 57; Defs.' Mem. 36.   Notably, the Settlement Agreement contains an opt-out provision, which states that, "as to damages claims set forth in Section 3.4 below, the Settlement Class will be certified pursuant to Federal Rule of Civil Procedure 23(b)(3), and all Settlement Class Members shall have the right to exclude themselves by way of the opt-out procedure set forth in the Preliminary Approval Order."   Sett. Agr. § 3.2.   Thus, individuals who meet the definition of the class are a part of the class, and parties to the Settlement Agreement, unless they affirmatively decline to participate. *See id.*   Plaintiffs assert that they are African-American; that they obtained a loan, secured by their home, from Defendants; and that Defendants were parties to the Settlement Agreement.   Am. Compl. ¶¶ 4, 7–14, 57, 127.   Moreover, Plaintiffs learned of the Settlement Agreement and never declined to participate.[8]   Rather, in this action, they complain that Defendants are in breach of the Settlement Agreement, thereby identifying themselves as parties to it.   Thus, Plaintiffs have alleged sufficiently that they were members of the settlement class for purposes of establishing the existence of a contract in their pleadings.   *See Smith v. Capital One Auto Finance, Inc.*, No. JKB-11-1023, 2012 WL 48380, at *3 (D. Md. Jan. 9, 2012) ("Generally, an absentee class member who receives adequate notice of an action to which his class is a party,

---

[7] Although the parties do not state the date that the United States District Court for the District of Massachusetts entered the Preliminary Approval Order, it necessarily was after November 25, 2009, when the last party signed the Settlement Agreement. *See* Sett. Agr. 34–47.

[8] It is true that Plaintiffs claim that they did not receive notice from Defendants of the Settlement Agreement.   Am. Compl. ¶¶ 59–62.   But, Plaintiffs eventually learned of the Settlement Agreement and did not seek to opt out of it.   *Id.* Further, the Settlement Agreement did not require Plaintiffs to opt into it to be parties to it. *See* Sett. Agr. § 3.2.

and who fails to opt out by the deadline stated in the notice, is bound by the disposition of the action, including settlement.").

The question is whether Defendants failed to perform any part of the Settlement Agreement with regard to Plaintiffs.  Section 3.5 of the Settlement Agreement provides that Defendants would have a "foreclosure avoidance/foreclosure mitigation program or programs" ("FAP") in effect until June 30, 2011 "to help borrowers experiencing serious financial hardship avoid foreclosure when [Defendants] determine[] that avoidance of foreclosure is reasonably possible."  Sett. Agr. § 3.5.  The Agreement states, *id.*:

> [Defendants] will provide notice of the FAP to each eligible borrower a reasonable time after the borrower becomes seriously delinquent. HSBC will not assess a fee for discussing the program with its borrowers unless permitted or required under a government-sponsored or government-recommended program, or by a government sponsored enterprise such as Fannie Mae or Freddie Mac. Nothing contained herein shall preclude [Defendants] from charging borrowers for actual costs incurred in connection with the FAP. . . .

Plaintiffs claim that Defendants breached this section by failing to notify them of or include them in the FAP, and "failing to reduce the Boardleys' monthly mortgage payment" to "help them avoid foreclosure."  Am. Compl. ¶ 157.  Noting that the Settlement Agreement only mandated the provision of the FAP until June 30, 2011, Defendants contend that Plaintiffs "do not plead that foreclosure was imminent prior to June 30, 2011 such that they could be considered eligible to be considered for the FAP program."[9]  Defs.' Mem. 37.  Defendants assert that Plaintiffs plead, to the contrary, "that it was not until July 2012 . . . that they were purportedly informed of any intent to foreclose on their property."  *Id.*; *see* Reply 12.  Plaintiffs

---

[9] To the extent that Defendants argue, in the alternative, that Maryland's three-year statute of limitations bars Plaintiffs' common-law claims, Defs.' Mem. 34, I note that the events relevant to this claim occurred less than three years before Plaintiffs filed suit, such that the statute of limitations is not a bar to Plaintiffs' breach of contract claim.  *See* Md. Code Ann., Cts. & Jud. Proc. 5-101; *Shailendra Kumar, P.A. v. Dhanda*, 43 A.3d 1029, 1033–34 (2012) (three-year statute of limitations in Cts. & Jud. Proc. § 5-101 applies to breach of contract breach actions).

insist that "the Boardleys were 'seriously delinquent' prior to June 30, 2011," owing $14,000 in April 2010 and over $60,000 by December 2010, such that Defendants' duties under the Settlement Agreement were triggered.  Pls.' Opp'n 19 (citing Am. Compl. ¶ 31).

Although the Agreement does not define "seriously delinquent," Plaintiffs' allegations that they owed $14,000 in April 2010 and more than $60,000 in December 2010, Am. Compl. ¶¶ 31, 39, provide sufficient alleged arrearages to have triggered Defendants' duty to inform Plaintiffs about the FAP prior to June 30, 2011.  Coupled with Plaintiffs' claim that Defendants never notified them of the FAP, *id.* ¶ 157, Plaintiffs have pleaded sufficient factual allegations to survive Defendants' Motion to Dismiss their breach of contract claim.[10]

### D.  Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 et seq. (Count III, which Plaintiffs mislabel as Count IV); Fair Housing Act (Count IV, which Plaintiffs mislabel as Count XIV); and Racial Discrimination in violation of the Civil Rights Act, 42 U.S.C. § 1981 (Count V, which Plaintiffs mislabel as Count XV)

The ECOA prohibits creditors from "discriminat[ing] against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race [or] color."  15 U.S.C. § 1691(a)(1); *see Capitol Indem. Corp. v. Aulakh*, 313 F.3d 200, 202 (4th Cir. 2002); *Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC-11-3758, 2013 WL 247549, at *6 (D. Md. Jan. 22, 2013). Similarly, the FHA provides that "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against

---

[10] Defendants also argue that "if it is true that Plaintiffs never received notice of either the class action or the Settlement Agreement, then Plaintiffs simply were not parties to the Settlement Agreement and have no basis upon which to assert a claim for breach of contract."  Reply 12. But, as discussed above, Plaintiffs' alleged lack of notice does not negate their alleged membership in the class to which the Settlement Agreement pertained.  Nor does their assertion that they did not release their discrimination claims negate their alleged class membership. *Contra* Reply 13.  Rather, they have alleged the Settlement Agreement sufficiently to survive the motion to dismiss, and the contract's actual existence is not before the Court at this time.

any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race [or] color."  42 U.S.C. § 3605(a). And, while the Civil Rights Act, "which was enacted shortly after the Civil War, does not use the modern statutory formulation prohibiting 'discrimination on the basis of race,' . . . that is the clear import of its terms."[11] *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 459 (2008).  "The statute assumes that 'white citizens' enjoy certain rights and requires that those rights be extended equally to '[a]ll persons,' regardless of their race. That is to say, it prohibits discrimination based on race."  *Id.*

According to Plaintiffs, Defendants violated these three acts by employing their "Discretionary Pricing Policy," which Plaintiffs characterize as "a commission-driven, subjective pricing policy that [Defendants] knew or should have known had a significant and pervasive adverse impact on black homeowners." Am. Compl. ¶ 47.  Plaintiffs claim that, through this policy, "black[s] and Hispanics paid disparately more discretionary charges (both in frequency and amount) than similarly situated whites."  *Id.* ¶ 46; *see id.* ¶ 89, and Defendants have "been able to collect more finance charges from African America[n]s and Hispanics than their white counterparts," and the additional finance charges "were not related to the natural effects of credit risk."  *Id.* ¶ 96; *see id.* ¶ 91. Specifically, Plaintiffs claim that Defendants charged "higher interest rates . . . to the Plaintiffs than their white counterparts."  *Id.* ¶ 102.

Noting that "Plaintiffs . . . contend that they are members of a class that was certified for purposes of settlement in Allen v. Decision One Mortgage Company, LLC, 07-11669 (D.

---

[11] 42 U.S.C. § 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Mass),” and that the United States District Court for the District of Massachusetts approved a settlement in that case, Defendants assert that “Plaintiffs clearly have released any and all ‘discrimination-based or discrimination-related claims’ against Defendants pursuant to the Settlement Agreement.”  Defs.’ Mem. 18.

> It is true that the Settlement Agreement provides that
>
> Plaintiffs and each Settlement Class Member . . . shall be deemed to have fully, finally and forever released all discrimination-based or  discrimination-related claims, causes of action, or liabilities, whether arising under local, state, or federal law, whether by statute, contract, common law, or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, as alleged or as could have been alleged based upon the facts asserted in the Consolidated Amended Complaint as to the Released Parties, except for claims against non- HSBC servicers based upon their post-origination activity. . . .

Sett. Agr. § 5.1.  It also is true that, through their pleadings, Plaintiffs have alleged sufficiently that they are parties to the Settlement Agreement for their claim of breach of that contract to survive Defendants’ Motion to Dismiss.  But, all that is needed for a claim to survive a Rule 12(b)(6) motion is for it to “allege facts sufficient ‘to raise a right to relief above the speculative level, thereby nudging [the plaintiffs’] claims across the line from conceivable to plausible.’” *Pitts v. U.S. Dep’t of Housing & Urban Dev.*, 546 F. App’x 118, 119 (4th Cir. 2013) (quoting *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alteration omitted))).  Thus, a factual allegation sufficient to survive a motion to dismiss is not tantamount to an established, undisputed fact.  *See id.*; *see also Smith v. Capital One Auto Fin., Inc.*, No. JKB-11-1023, 2012 WL 48380, at *3 (D. Md. Jan. 9, 2012) (stating elements necessary to show that participation in class action settlement precludes claims).  Indeed, Defendants do not concede that Plaintiffs are parties to the Settlement Agreement, *see* Defs.’ Mem. 19, and Plaintiffs only allege as much

where the allegation supports their claim, *compare* Am. Compl. ¶¶ 155–57 (alleging that Defendants breached their obligations to Plaintiffs under the Agreement), *with* Pls.' Opp'n 14 (arguing that Plaintiffs are not bound by Agreement).  Thus, it is not settled that Plaintiffs released any and all claims of discrimination, and therefore, the alleged release is not grounds for dismissing their ECOA, FHA and Civil Rights Act claims.

Nonetheless, even if Plaintiffs have not released these claims, and assuming *arguendo* that the claims are not time-barred, Plaintiffs nevertheless fail to state a claim under the ECOA, FHA or Civil Rights Act.  For cases that do not involve direct evidence of discrimination, this Court analyzes ECOA, FHA, and Civil Rights Act race discrimination claims under the *McDonnell Douglas* burden-shifting framework.  *See Painter's Mill Grille, LLC v. Brown*, No. RDB-11-1607, 2012 WL 576640, at *5 (D. Md. Feb. 21, 2012) (discussing Civil Rights Act and citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Wise v. Vilsack*, 496 F. A'ppx 283, 285 (4th Cir. 2012) (discussing ECOA); *Letke v. Wells Fargo Home Mortg., Inc.*, No. RDB-12-3799, 2013 WL 6207836, at *3 (D. Md. Nov. 27, 2013) (discussing FHA).  Under this framework, the plaintiff first must establish a prima facie case of race discrimination and, if the plaintiff does so, then "'the burden shifts to defendants to show a legitimate nondiscriminatory reason for their actions.'"  *Letke*, 2013 WL 6207836, at *3 (quoting *Matarese v. Archstone Pentagon City*, 761 F. Supp. 2d 346, 362 (E.D. Va. 2011) (citing *McDonnell Douglas*, 411 U.S. at 802–05)). Ultimately, "'the burden returns to plaintiff to demonstrate that the reason was a pretext.'"  *Id.* (quoting *Matarese*, 761 F. Supp. 2d at 362 (citing *McDonnell Douglas*, 411 U.S. at 802–05)).

*1.   Civil Rights Act*

To state a prima facie case of "discrimination under 42 U.S.C. § 1981 in the context of goods and services," such as a line of credit, a plaintiff must allege that

> "(1) he is a member of a protected class; (2) he sought to enter into a contractual relationship with the defendant; (3) he met the defendant's ordinary requirements to pay for and to receive goods or services ordinarily provided by the defendant to other similarly situated customers; and (4) he was denied the opportunity to contract for goods or services that was otherwise afforded to white customers."

*Painter's Mill Grille*, 2012 WL 576640, at *6 (quoting *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004)); *see Zeno v. Chevy Chase Bank*, No. PJM-08-2236, 2009 WL 4738077, at *1–2 (D. Md. Dec. 4, 2009) (applying elements in context of bank's alleged refusal to open account for plaintiffs).

While Plaintiffs have alleged that they are African-American, that they sought a line of credit from Defendants, and that they were denied the loan they initially sought, *see Painter's Mill Grille*, 2012 WL 576640, at *6, they have not stated a claim under the Civil Rights Act. Fatally, Plaintiffs fail to claim that they were qualified for the line of credit they sought. *See id.* Additionally, Plaintiffs make only unsupported vague claims with regard to the treatment of the protected class in comparison to others outside the class, such as that Defendants' pricing policy "had a significant and pervasive adverse impact on black homeowners," 2d Am. Compl. ¶ 47, and that "black[s] and Hispanics paid disparately more discretionary charges (both in frequency and amount)" and higher interest rates "than similarly situated whites," *id.* ¶¶ 46, 96, 102; *see id.* ¶¶ 89, 91.   Consequently, Plaintiffs offer only conclusory allegations that others outside their protected class received loans on more favorable terms.   These "[t]hreadbare recitals of the elements of [the] cause of action, supported by mere conclusory statements, do not suffice." *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  Therefore, Plaintiffs have failed to state a Civil

Rights Act claim.  *See Iqbal*, 556 U.S. at 678–79.

### 2.  ECOA

The elements for a prima facie case of ECOA lending discrimination are less well-settled.

In unpublished opinions, the Fourth Circuit stated the elements as:

> 1) [plaintiffs] are members of a protected class; 2) they applied for and were
> qualified for an extension of credit; 3) [the defendant] rejected their application
> for credit despite their qualifications; and 4) [the defendant] continued to extend
> credit to others of similar credit stature outside of the [plaintiffs'] protected class.

*Wise v. Vilsack*, 496 F. A'ppx 283, 285 (4th Cir. 2012) (collecting cases "[a]pplying *McDonnell*

*Douglas* in the ECOA context" and noting that the Fourth Circuit "followed suit in [its] sole

unpublished opinion on the subject[,] *Crestar Bank v.* Driggs, 995 F.2d 1062 (4th Cir. 1993)").

But, this Court has stated:

> "As applied in an ECOA case, the *McDonnell Douglas* formulation requires that
> the plaintiff make out a prima facie case of discrimination by offering evidence
> indicating: (1) that the plaintiff belongs to a class protected by the statute; (2) that
> he applied for credit for which he was qualified; and (3) that he was rejected
> despite his qualifications."

*Letke v. Wells Fargo Home Mortg., Inc.*, 2013 WL 6207836, at *4 (D. Md. Nov. 27, 2013)

(quoting *Faulkner v. Glickman*, 172 F. Supp. 2d 732, 737 (D. Md. 2001)).

To understand the rationale for this Court's apparent elimination of the element

comparing the plaintiff to similarly-situated individuals who are not members of the protected

class, *Best Medical International, Inc. v. Wells Fargo Bank, N.A.*, 937 F. Supp. 2d 685 (E.D. Va.

2013), is insightful. There, the Eastern District of Virginia considered the elements of a claim of

lending discrimination in violation of § 1981 and adopted the prima facie elements from

*Anderson v. Wachovia Mortgage Corp.*, 621 F.3d 261 (3d Cir. 2010), which replaced the "often-

applied requirement of demonstrating different treatment for a similarly situated individual

outside of plaintiff's class" with "additional evidence demonstrating a causal nexus between the harm and the plaintiff's membership in a protected class." *Best Med. Int'l*, 937 F. Supp. 2d at 697. The court reasoned that, "[u]nlike the employment context, where a plaintiff may experience less difficulty identifying individuals with similar qualifications, skills, or years of experience, the lending process involves discrete and varying circumstances inherent in individual loan applications and approvals.'" *Id.* (quoting *Anderson*, 621 F.3d at 273). On that basis, it concluded that "adjusting the causal element was proper because 'requiring evidence of similarly situated individuals in the lending context would be overly burdensome' due to the volume of documents, confidentiality concerns, and the difficulty in identifying which applicants are similarly situated." *Id.* (quoting *Anderson*, 621 F.3d at 274). The Eastern District of Virginia held that

> a successful prima facie case of lending discrimination in violation of § 1981 must present evidence that (1) the plaintiff belongs to a protected class of individuals, (2) the plaintiff applied and was qualified for credit made available by the defendant, (3) the defendant either denied the application or approved it subject to unreasonable or overly burdensome conditions, and (4) additional evidence demonstrates a causal nexus between the harm and plaintiff's membership in a protected class.

*Id.*

Because I am persuaded by the analysis in *Best Medical International*, I will address whether Plaintiffs have alleged the three elements previously identified by this Court: "(1) that the plaintiff belongs to a class protected by the statute; (2) that he applied for credit for which he was qualified; and (3) that he was rejected despite his qualifications." *Letke*, 2013 WL 6207836, at *4. I conclude that because, as discussed above, Plaintiffs do not allege their qualifications, Plaintiffs' pleadings fall short with regard to their ECOA lending discrimination claim. *See*

*Letke*, 2013 WL 6207836, at *4.[12]  Therefore, Plaintiffs also have failed to state an ECOA claim.
*See Iqbal*, 556 U.S. at 678–79.

### 3.  FHA claim

To state a claim for FHA discrimination, "'[p]laintiffs must allege that they were discriminated against within the meaning of the FHA by showing: 1) discriminatory intent; or 2) discriminatory impact.'" *Letke*, 2013 WL 6207836, at *3 (quoting *Robinson v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty., MD*, No. RDB–07–1903, 2008 WL 2484936, at *9 (D. Md. June 19, 2008) (citing *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir. 1984))). Plaintiffs bring a discriminatory impact claim by challenging Defendants' "Discretionary Pricing Policy" as a "facially neutral policy that actually or predictably results in discrimination." *See id.* at *3 n.2 (defining a discriminatory impact claim).  Specifically, Plaintiffs claim that Defendants' policy was "a commission-driven, subjective pricing policy" and that Defendants "knew or should have known" that the policy would have "a significant and pervasive adverse impact on black homeowners." Am. Compl. ¶ 47.

> To establish a prima facie case of disparate impact discrimination, plaintiffs must show that a specific policy caused a significant disparate effect on a protected group. To do this, they must identify the problematic neutral practice at issue . . . . *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988). In making this showing, plaintiffs are required to prove only that a given policy had a discriminatory impact on them as individuals. *Betsey*, 736 F.2d at 987. Thus, to determine whether plaintiffs have met their burden, "[t]he correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied." *Id.*

*Letke*, 2013 WL 6207836, at *4 (quoting *Matarese*, 761 F. Supp. 2d at 363).  Plaintiffs have identified a "specific policy," the "Discretionary Pricing Policy." *See id.*  But, stating that the

---

[12] I note that Plaintiffs claim necessarily also fails under the more onerous test set forth in *Wise*, 496 F. A'ppx at 285.

policy "had a significant and pervasive adverse impact on black homeowners," Am. Compl. ¶ 47, is not tantamount to "show[ing] that [the] policy caused a significant disparate effect on a protected group." *See Letke*, 2013 WL 6207836, at *4. Plaintiffs' claims that members of protected groups paid more discretionary charges, such as finance charges, and higher interest rates, are conclusory allegations that do not suffice to state a claim. *See Iqbal*, 556 U.S. at 678–79. Moreover, Plaintiffs have had the opportunity to amend twice, without curing this deficiency. Consequently, Plaintiffs fail to state a claim under the FHA. *See id.*

### E. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO") (Count VI, which Plaintiffs mislabel as Count IV)

Plaintiffs do not oppose the dismissal of their RICO claim, Pls.' Opp'n 15. Indeed, Plaintiffs seek leave to delete this claim from their Amended Complaint. Pls.' Mot. to Am. 2. Therefore, with regard to Count VI, RICO, Defendants' Second Motion to Dismiss is granted, and this Count is dismissed with Plaintiffs' consent.

### F. Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13- 101 et seq. (Count VII, which Plaintiffs mislabel as Count V)

The MCPA provides that "'a person may not engage in any unfair or deceptive trade practice,'" such as making a "false or misleading statement[]," in relation to "'[t]he extension of consumer credit' or the 'collection of consumer debts.'" *Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC-11-3758, 2013 WL 247549, at *10 (D. Md. Jan. 22, 2013) (quoting Com. Law § 13-303). Further, it provides for a private action pursuant to Com. Law § 13-408. To state a claim under the MCPA, a plaintiff "'must allege (1) an unfair or deceptive trade practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury.'" *Bey v. Shapiro Brown & Alt, LLP*, ---- F. Supp. 2d ----, 2014 WL 661586, at *7 (D. Md. 2014) (quoting *Stewart v. Bierman*, 859 F. Supp. 2d 754, 759 (D. Md. 2012)).

1.   *MCPA claim in Amended Complaint*

In their Amended Complaint, Plaintiffs claim that "Defendants made statements that had the capacity, tendency, and effect of misleading the Boardleys into believing that their mortgage payment would be reduced after six (6) months, and that it had in fact been reduced."  Am. Compl. ¶ 122.  They also claim that

> the Boardleys were lured into the Defendants' offices for a certain extension of credit, but Defendants switched the offer, and offered a separate product with a higher cost to the Boardleys, even though it was not necessary, and [Plaintiffs] did so based upon false representations of materials fact that Defendants would reduce the mortgage payments later, and then Defendants again switched by claiming reduction was not available, except through "deferments" about which Defendants made more false representations of material fact.

*Id.* ¶ 123.  Additionally, they allege that, as a result of the "disadvantageous" terms of the loan, for which they did not have "the opportunity to lower their monthly payments," as they believed they would have, "they have suffered severe financial injury, including the fact that the Boardleys owe more on the Mortgage than what the Property is worth."  *Id.* ¶ 126.  Specifically, they claim that they "spent approximately $62,000 of their personal savings believing that Defendants would honor the representations that the monthly mortgage payment would be reduced."  *Id.* ¶ 55.  Through these allegations, Plaintiffs have stated that Defendants made misleading or deceptive statements that led Plaintiffs to enter the loan agreement and lose $62,000, satisfying the elements of an MCPA claim.  *See Bey*, 2014 WL 661586, at *7.

But, as noted, dismissal may be based on an affirmative defense that is apparent on the face of the complaint.  *Jones v. Bock*, 549 U.S. 199, 214–15 (2007).  Significantly, a three-year statute of limitations applies to claims under the MCPA.  *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101; *Master Fin., Inc. v. Crowder*, 972 A.2d 864, 872 (Md. 2009).  Plaintiffs' allegations in the Amended Complaint all relate to the inception of the loan, which they entered into in June

2007, well over three years before they filed suit.  Notably, "the discovery rule generally applies to a cause of action brought under § 5–101," such that "'the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong.'"  *Walton v. Wells Fargo Bank, N.A.*, No. AW-13-428, 2013 WL 3177888, at \*6 (D. Md. June 21, 2013) (quoting *Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981)).  Plaintiffs may not have discovered the alleged wrong until they attempted to refinance, but they alleged that they attempted, without success, to refinance in late 2007 or early 2008, Am. Compl. ¶¶ 14–15, still well over three years before they filed suit in October 2012.  Therefore, their MCPA claim, as stated in their Amended Complaint, is time-barred.  *See* Cts. & Jud. Proc. § 5-101; *Walton*, 2013 WL 3177888, at \*6; *Master Fin.*, 972 A.2d at 872.

### 2.  *MCPA claim in proposed Second Amended Complaint*

In their Second Amended Complaint, Plaintiffs add allegations that "Defendants made false representations . . . regarding the Boardley's account, which prevented the Defendants from discussing the account with the Boardleys," and "misled the Boardleys to believe that nothing could be done to address . . . anything at all about the account."  2d Am. Compl. ¶ 128.  Plaintiffs also claim that Defendants' assertion in 2012 that they did not know about the class action was a false representation that "misled the Boardleys to believe that Defendants could not . . . and/or . . . had not in fact identified the subject lawsuit."  *Id.* ¶ 129.  Finally, they allege that Defendants falsely represented in 2012 that "they had never entered into a permanent agreement with the Boardleys involving a monthly payment of approximately $1,200."  *Id.* ¶ 130.

Plaintiffs argue that these amendments are not futile because "they provide additional evidence of Defendants' misconduct and serve to cure any alleged deficiency of pleading."  Pls.' Mot. to Am. 3.  Indeed, none of these alleged misrepresentations, made after October 11, 2009,

would be time-barred.  *See* Cts. & Jud. Proc. § 5-101; *Walton*, 2013 WL 3177888, at *6; *Master Fin.*, 972 A.2d at 872.

Nonetheless, Defendants challenge whether Plaintiffs established the last element of their MCPA claim, contending that "Plaintiffs' attempt to amend the MCPA [claim] must . . . fail since Plaintiffs did not suffer any injury or damages as a result of any purported misrepresentations."  Defs.' Opp'n 2. According to Defendants, Plaintiffs must claim an "'identifiable loss.'"  *Id.* at 10 (citing *Legore v. OneWest Bank, FSB*, No. 11-0589, 2012 WL 4903087, *7 (D. Md. Oct. 15, 2012) (stating that an "'identifiable loss'" is "'measured by the amount the consumer spent or lost as a result of his or her reliance on the [defendant's] misrepresentation'" (quoting *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007))).  In *Legore*, the Court found that there was no "identifiable loss" because the plaintiff "conceded that he ha[d] suffered no economic harm" as a result of the defendant's actions.  2012 WL 4903087, at *7.

Here, Plaintiffs have alleged that these misrepresentations caused actual loss:  They claim that, due to Defendants' misrepresentations, Plaintiffs did not have the opportunity to negotiate lower terms for the loan or to participate in the FAP, and consequently they were obligated to pay the higher amount each month.  The difference between what Plaintiffs paid each month and the reduced amounts that they allegedly should have been able to pay instead is the actual loss.  *See Legore*, 2012 WL 4903087, *7; *Lloyd*, 916 A.2d at 277.

Defendants also challenge whether any of the alleged statements qualified as misrepresentations to satisfy the first element of the claim.  They admit that their representative provided "inaccurate information" about their ability to discuss Plaintiffs' account, but Defendants insist that the statement was not a misrepresentation but rather "a mistake by a

customer representative." Defs.' Opp'n 11-12. Regardless of the self-serving gloss with which Defendants characterize their representative's intentions, it is clear that this statement was incorrect. Defendants insist that there cannot be any related damages because Defendants remedied their error "merely fourth months" later. *Id*. at 12.

As for the statements about the Settlement Agreement, Defendants insist that Plaintiffs did not provide them with enough information when they informed Defendants that someone filed a class action against Defendants in September 2007, that Plaintiffs are members of the class, and that the case resulted in a class settlement agreement on November 27, 2009. *Id.* On that basis, Defendants argue that "it was reasonable for Household to request further information and clarification," rather than providing information to Plaintiffs. *Id.* And, with regard to the alleged agreement for $1,200 monthly payments, Defendants argue that Plaintiffs only claim that "a representative of Household indicat[ed] that their loan would be adjusted to 2%" and that they received "payment coupons in the amount of $1,512.68." *Id.* at 13. In Defendants' view, these assertions are not equivalent to stating that "the payment would be ***$1,200*** or that such an adjustment would be ***permanent***." *Id.* (emphasis in Opp'n). Defendants concede that, at one point, due to an error entering information in Plaintiffs' account, "the account incorrectly reflecting a monthly payment amount of $1,262.28." *Id.* (emphasis in Opp'n).

Defendants' assertions may amount to a dispute of material fact, but for purposes of determining whether Plaintiffs have stated a claim, I accept the facts that Plaintiffs alleged in their Amended Complaint and, where relevant, Second Amended Complaint, as true. *See Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011). I find that Plaintiffs have alleged these misrepresentations sufficiently. Therefore, it would not be futile for Plaintiffs to amend their

Amended Complaint as proposed, and their Motion for Leave to Amend is granted with regard to the MCPA claim.

### G. Negligence (Count VIII, which Plaintiffs mislabel as Count VI); Negligent Supervision (Count IX, which Plaintiffs mislabel as Count VII); and Fraudulent Concealment (Count XI, which Plaintiffs mislabel as Count IX)

Plaintiffs claim that "Defendants and their representatives held themselves out as professionals in the mortgage industry, deserving of trust and confidence, and . . . as co-parties with the Boardleys under a trust agreement pertaining to an estate in real property." Am. Compl. 129. On this basis, they contend that Defendants "owed a legal duty to exercise reasonable care in their dealings with the Boardleys." *Id*. They allege that Defendants breached this duty, causing financial harm to Plaintiffs, and therefore are liable for negligence. *Id*. ¶¶ 132–34. Plaintiffs also claim negligent supervision, in that "Defendants did not properly oversee their representatives" to prevent the misrepresentations that their representatives allegedly made to Plaintiffs, and as a result Plaintiffs suffered financial harm. *Id*. ¶¶ 136–37. With regard to fraudulent concealment, Plaintiffs claim that "Defendants owed a legal duty to the Boardleys that includes a duty to disclose to them all material terms regarding their loan," but failed to make various disclosures. Am. Compl. 145–49. According to Plaintiffs, Defendants "intended to deceive" them to induce them to enter into the loan agreement, Plaintiffs "reasonably relied upon Defendants' representations," and "[a]s a result of this reliance, Defendants have trapped the Boardleys" in a loan agreement with monthly payments that they cannot afford. *Id. ¶¶* 150–52.

To state a claim for negligence, Plaintiffs must allege "(a) a duty owed by the defendant[s] to the plaintiff[s], (b) a breach of that duty, and (c) injury proximately resulting from that breach." *Barclay v. Briscoe*, 47 A.3d 560, 574 (Md. 2012). The elements of negligent supervision are the same. *First Fidelity Home Mortg. Co. v. Williams*, 56 A.3d 501, 512 (Md.

Ct. Spec. App. 2012).  To state a claim for fraudulent concealment, Plaintiff also must allege that Defendants owed them a duty, specifically, the duty "to disclose a material fact."  *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1059 (Md. 1999).   The remaining elements of fraudulent concealment are that "the defendant failed to disclose that fact; . . . the defendant intended to defraud or deceive the plaintiff; . . . the plaintiff took action in justifiable reliance on the concealment; and . . . the plaintiff suffered damages as a result of the defendant's concealment." *Id.*

Defendants argue that "Plaintiffs' claims that rely on the existence of an underlying duty – negligence, negligent supervision, and fraudulent concealment – must fail as a matter of law for Plaintiffs cannot establish that Defendants owed them a duty."  Defs.' Mem. 30.   They contend that "Plaintiffs have not alleged, and cannot allege, any facts that suggest the existence of any of the 'special circumstances' that could potentially lead to the finding of a fiduciary duty."  *Id.* at 31.  Alternatively, they argue that there is not "any independent contractual basis for finding a heightened duty by Defendants."  *Id.* at 31–32.  With regard to Plaintiffs' fraudulent concealment claim, Defendants argue that they "did not owe Plaintiffs a duty of care outside of their contractual relationship and thus owed no duty to disclose."  *Id.* at 34.

Plaintiffs' entire counterargument is as follows:

Contrary to Defendants' argument that Plaintiff has failed to allege a duty owed by Defendants to Plaintiffs, Defendants owe the basic legal duty to exercise reasonable care in their dealings with others. Restatement (Second) of Torts § 298 (the duty of care is what a, "reasonable man in his position, with his information and competence, would recognize as necessary to prevent the act from creating an unreasonable risk of harm to another."). Defendants violated this duty in the manner laid out in ¶'s 128-137 of the First Amended Complaint.

Pls.' Opp'n 18.

The fault in Plaintiffs' argument is that there is no universal duty to exercise reasonable care.  *See Premium of Am., LLC v. Sanchez*, 73 A.3d 343, 354 (Md. Ct. Spec. App. 2013).  Rather, tort liability exists only where "'the law will give recognition and effect'" to "'an obligation . . . to conform to a particular standard of conduct toward another.'"  *Id.* (quoting *Gourdine v. Crews*, 955 A.2d 769 (Md. 2008) (citation omitted)).  Significantly, "'absent that duty, there can be no negligence.'"  *Id.* (quoting *Barclay v. Briscoe*, 47 A.3d 560, 574 (Md. 2012) (citation omitted)).  Therefore, "'when analyzing a negligence action it is customary to begin with whether a legally cognizable duty exists.'"  *Id.* (quoting Pendleton v. State, 921 A.2d 196 (Md. 2007)).Plaintiffs' pleadings refer to Defendants presenting themselves "as professionals in the mortgage industry, deserving of trust and confidence" and "a legitimate banking organization worthy of the Boardleys' trust," which could be construed as an allegation of a fiduciary duty, and "as co-parties with the Boardleys under a trust agreement," which could be construed as an allegation of a contractual duty.  *See* Am. Compl. ¶¶ 129 & 151.  Although "tort liability may be imposed upon contractual privity or its equivalent, . . . there must have been a breach of the duty owed under the terms of the contract."  *Yousef v. Trustbank Sav. F.S.B.*, 568 A.2d 1134, 1138 (Md. Ct. Spec. App. 1990).  Here, Plaintiffs refer to a "trust agreement," but they do not identify the terms of this contract that give rise to the duty "to exercise reasonable care" that Plaintiffs claim Defendants had.  Nor do Plaintiffs refer to this alleged agreement elsewhere in the Amended Complaint.  Thus, they have not alleged the terms of this agreement sufficiently for it to be the basis for Defendants' breach.  Moreover, although Plaintiffs have alleged a loan agreement, *see* Am. Compl. ¶¶ 7–14, they have not alleged that the loan agreement imposed upon Defendants a duty to exercise reasonable care.  Therefore, it also cannot be the basis for Defendants' breach.

Thus, these claims must be based on an alleged breach of a fiduciary duty. *See* Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* 522–27 (5th ed. 2013) (noting that, while no independent cause of action exists for breach of fiduciary duty, breach of fiduciary duty can be alleged as an element of another cause of action, such as negligence).  For a fiduciary duty to be breached, Defendants must be in a fiduciary relationship with Plaintiffs. *See id.* at 525–26 (stating that elements of claim for negligence based on breach of a fiduciary duty are (1) *a fiduciary relationship existed*, (2) the fiduciary breached the duty it owed to the beneficiary, and (3) the breach caused harm to the beneficiary); *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 685 n.46 (Md. Ct. Spec. App. 2012) (stating elements).

"'A fiduciary relationship . . . involves a duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation.'" *Lasater v. Guttman*, 5 A.3d 79, 93 (Md. Ct. Spec. App. 2010) (quoting *Buxton v. Buxton*, 770 A.2d 152, 164 (Md. 2001) (citation and quotation marks omitted)).  It is more than a "'confidential relationship,'" which only requires that one party "'has gained the confidence of the other and purports to act or advise with the other's interest in mind.'"  *Id.* (quoting *Buxton*, 770 A.2d at 164 (citation and quotation marks omitted)).  Examples of fiduciary relationships include "'trustee and beneficiary, guardian and ward, agent and principal, attorney and client, partners in a partnership, corporate directors and their corporation.'"  *Id.* (citation and quotation marks omitted).

Here, Defendant HSBC is a "banking and financial services holding company," and its subsidiary, Defendant Household, is a local bank; Plaintiffs are their customers.  Am. Compl. ¶¶ 5–6.  In contrast with the fiduciary relationships described above, "the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and

creditor, and is not fiduciary in nature." *Yousef v. Trustbank Sav. F.S.B.*, 568 A.2d 1134, 1138 (Md. Ct. Spec. App. 1990) (citations omitted); *see Keuchler v. Peoples Bank*, 602 F. Supp. 2d 625, 633–34 (D. Md. 2009) (quoting *Yousef*). Indeed, "Maryland law is cautious in creating fiduciary obligations between banks and borrowers, absent special circumstances." *Polek v. J.P. Morgan Chase Bank, N.A.*, 36 A.3d 399, 418 (Md. 2012). As Defendants note, special circumstances under which a Maryland court may impose a fiduciary duty on a bank

> include[e] where the lender: "(1) took on any extra services on behalf of [the borrowers] other than furnishing ... money ...; (2) received a greater economic benefit from the transaction other than the normal mortgage; (3) exercised extensive control ...; or (4) was asked by [the borrowers] if there were any lien actions pending."

*Id.* (quoting *Parker v. Columbia Bank*, 604 A.2d 521, 534–35 (Md. Ct. Spec. App. 1992).

Plaintiffs have not alleged any such circumstances or other "special circumstances" giving rise to a fiduciary relationship under which to impose a fiduciary duty on Defendants as lending institutions. *See id.* Therefore, Plaintiffs have failed to establish the duty element of their claims for negligence, negligent supervision, and fraudulent concealment. *Dynacorp Ltd.*, 56 A.3d at 685 n.46. Defendants' Motion to Dismiss is granted with regard to these three claims.

### H. Fraud (Count X, which Plaintiffs mislabel as Count VIII)

To state a claim for fraud under Maryland law, Plaintiffs

> "must allege five elements with particularity: (1) the defendant[s] made a false statement of fact; (2) the defendant[s] knew the statement was false or acted with reckless disregard for the truth of the statement; (3) the defendant[s] made the statement for the purpose of defrauding the plaintiff[s]; (4) the plaintiff[s] reasonably relied on the false statement, and (5) the plaintiff[s] w[ere] damaged as a result."

*Marchese v. JPMorgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 465 (D. Md. 2013) (quoting *Thompson v. Countrywide Home Loans Servicing, L.P.*, No. L–09–2549, 2010 WL 1741398, at

*3 (D. Md. Apr. 27, 2010) (citing *Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534 (Md. 1982))).

Also, as noted, Plaintiffs must meet the "heightened pleading standard under Rule 9(b)," by

"'stat[ing] with particularity the circumstances constituting the fraud.'" *Piotrowski v. Wells*

*Fargo Bank, N.A.*, No. DKC-11-3758, 2013 WL 247549, at *5 (D. Md. Jan. 22, 2013); *see*

*Spaulding v. Wells Fargo Bank, N.A.*, No. 12-1973, 2013 WL 1694549, at *9 (4th Cir. Apr. 19,

2013).  However, Rule 9(b) permits "intent, knowledge, and other conditions of a person's mind

[to] be alleged generally."  Fed. R. Civ. P. 9(b).

Plaintiffs claim that they attempted, without success, to refinance in late 2007 or early

2008, Am. Compl. ¶¶ 14–15, and that "Defendants either intentionally misrepresented to the

Boardleys that their monthly mortgage payment could be reduced after six (6) months or failed

to disclose any information regarding the unavailability of that adjustment in a timely manner,"

*id.* ¶ 139.  They also allege that "Defendants either intentionally misrepresented the repayment

terms of the 'deferment' plans to the Boardleys or failed to disclose any information that would

have clarified the plan in a material way." *Id.* ¶ 140.

Defendants contend that a three-year statute of limitations bars the fraud count because

Plaintiffs "were aware that they could not refinance or restructure the Loan and could not afford

monthly payments on the Loan by August 2008."  Defs.' Mem. 34–35.  It is true that a three-year

statute of limitations applies to fraud claims under Maryland common law.  *See* Md. Code Ann.,

Cts. & Jud. Proc. § 5-101.  Thus, insofar as Plaintiffs' fraud claim is based on their inability to

refinance in late 2007 or early 2008, it accrued at that time, which was well over three years

before they filed suit in October 2012. *See* Cts. & Jud. Proc. § 5-101; *Walton*, 2013 WL

3177888, at *6; *Master Fin.*, 972 A.2d at 872.  But, Plaintiffs allege that they entered into a

deferment plan as late as May 2010, *see* Am. Compl. ¶ 33, well within the statute of limitations.

*See* Cts. & Jud. Proc. § 5-101.  Therefore, to the extent that Plaintiffs' fraud claim is based on alleged misrepresentations concerning the terms of the May 2010 deferment plan, it is timely.

Insisting that "the Complaint identifies *conclusions* Plaintiffs allegedly drew from purportedly false representations by certain persons," Defendants contend that "the Complaint is wholly devoid of any allegations setting forth the content of the alleged representations themselves," such that, with regard to their fraud claim, "Plaintiffs do not sufficiently plead the time, place, and contents of the allegedly false representations identified in the Complaint." Defs.' Mem. 29 (emphasis in Mem.).  Plaintiffs counter that "the Boardleys have alleged how statements were made and the time, place, and content of the statements and who was making them in ¶¶'s 10, 11, 13, 15, 18, 19, 22, 23, 24, 27, 28, 30-39, and 44, of the First Amended Complaint."  Pls.' Opp'n 17–18.

Plaintiffs have alleged with particularity that, in April and July 2010, Defendants and their "representative[s]" intentionally made false statements about the availability of a lower monthly payment and what Plaintiffs had to do to be eligible for the lower payments, Am. Compl. ¶¶ 33–35, 140; that Plaintiffs "reasonably relied" upon the statements that made, *id.* ¶ 141; and that "[t]hese intentional misrepresentations or failures to disclose led to serious financial injury to the Boardleys," *see id.* ¶ 142.  Nonetheless, they have not alleged all elements of fraud under Maryland law because they have not claimed that Defendants made these statements "for the purpose of defrauding the plaintiff[s]."  *See Marchese*, 917 F. Supp. 2d at 465.  Thus, Plaintiffs have not stated a claim for fraud.  *See id.*; Fed. R. Civ. P. 9(b).

## V.      CONCLUSION

In sum, for the reasons stated above, Defendants' Motion to Dismiss IS GRANTED IN PART AND DENIED IN PART.  As noted, Plaintiffs have failed to state a claim under RESPA,

TILA, ECOA, FHA, or the Civil Rights Act, or for negligence, negligent supervision, fraudulent concealment, or fraud.  Also, Plaintiffs agree to the dismissal of their RICO claim.  Accordingly, Counts I – VI and VIII – XI ARE DISMISSED.  *See* Fed. R. Civ. P. 12(b)(6).  Plaintiffs have stated a claim for breach of the Settlement Agreement.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 663, 678-79 (2009).  Additionally, Plaintiffs' Motion for Leave to Amend IS GRANTED IN PART AND DENIED IN PART.  Plaintiffs may amend their Amended Complaint solely with regard to their MCPA claim, and Defendants' Motion to Dismiss Plaintiffs' MCPA claim IS DENIED AS MOOT in light of this ruling.  Accordingly, the Second Amended Complaint is the operative complaint, with only Count XII, for Breach of Settlement Agreement, and Count VII, for a violation of the MCPA, remaining.

Defendants shall file Answers no later than August 29, 2014, at which time the Court will enter a Scheduling Order and schedule a Fed. R. Civ. P. 16 conference call with the parties to discuss further pretrial proceedings.

A separate order will issue.


Dated: <u>August 14, 2014</u>                                 <u>        /S/                      </u>
                                                                    Paul W. Grimm
                                                                    United States District Judge

lyb